REED SMITH LLP
Jesse L. Miller (SBN 183229)
jmiller@reedsmith.com
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone:    (415) 543-8700
Facsimile:    (415) 391-8269

REED SMITH LLP
Carla M. Wirtschafter (SBN 292142)
cwirtschafter@reedsmith.com
1901 Avenue of the Stars, Suite 700
Los Angeles, CA  90067-6078
Telephone:    (310) 734-5200
Facsimile:    (310) 734-5299

Attorneys for Plaintiff
BRIGHT LITE STRUCTURES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIGHT LITE STRUCTURES, LLC, a Delaware limited liability company;<br><br>Plaintiff,<br><br>v.<br><br>BALFORM, LTD., an English limited company, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.:  3:20-cv-567<br><br>**COMPLAINT FOR**<br><br>**1) FRAUD IN THE INDUCEMENT;**<br><br>**2) FRAUDULENT CONCEALMENT; AND**<br><br>**3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiff Bright Lite Structures, LLC ("Plaintiff") asserts the following claims against Defendant Balform Ltd. ("Defendant").

## I. INTRODUCTION

1. Plaintiff is a design and manufacturing company that has developed a patented composite carbon fiber technology. Using its award-winning technology, Plaintiff supplies carbon fiber components to aerospace, commercial vehicle and auto manufacturers.

2. In early 2019, one of Plaintiff's key customers hired Plaintiff to provide aircraft seatbacks ("the Project"). In order to complete the Project, Plaintiff needed thermoplastic seatback skins ("the Parts"), which are a critical component of the Project.

3. Plaintiff hired Defendant to manufacture of the Parts. Defendant was fully informed that the Parts were a necessary component of the Project, and that Defendant's timely production of the Parts was crucial to Plaintiff's ability to satisfy its obligations to its customer. To assist Defendant in producing the Parts, Plaintiff created and provided to Defendant special tooling to be used in the manufacturing process (the "Tool").

4. Defendant *twice* falsely promised that it could perform when it knew or should have known that it could not. Defendants not only failed to timely manufacture thee necessary Parts, but also damaged, irreparably, the Tool Plaintiff had specially created to manufacture the Parts. Defendant's failure to perform caused Plaintiff to miss a delivery deadline to its customer, and after spending tens of thousands of dollars to try to repair the Tool that Defendant damaged, only to find that the Tool was damaged beyond repair and will have to be replaced. Plaintiff, now, brings this action to recover damages and to hold Defendant liable for its false promises, on which Plaintiff reasonably relied, to its detriment.

## II. THE PARTIES

5. Plaintiff is Delaware limited liability company, with its principal place of business in San Francisco, California.

6. Bright Lite Structures, Ltd. is a wholly owned subsidiary of Plaintiff. It performs certain manufacturing services on behalf of Plaintiff, and its business is done at the direction of and

1 for the benefit of Plaintiff.  All supplier and customer invoicing, documentation and orders are handled
2 by Plaintiff, and are signed, authorized and approved by Plaintiff's CEO.

3     7.     Defendant is a private limited company registered in the United Kingdom.  Upon
4 information and belief, Plaintiff alleges that Defendant markets and advertises its services worldwide
5 through its website and social media pages.

6     8.     Plaintiff is ignorant of the true names and capacities of the defendants sued as DOES 1
7 through 10, inclusive, and therefore sues these defendants by fictitious names. Plaintiff will amend its
8 Complaint to allege the true names and capacities of the DOE defendants upon discovery of such
9 information.  Plaintiff is informed and believes, and based thereon alleges, that Defendant and DOES
10 1 through 10 each caused the damages alleged herein to Plaintiff.  Plaintiff is also informed and
11 believes, and based thereon alleges, that Defendant and DOES 1 through 10 are each co-conspirators,
12 agents, employees and/or joint ventures of the other defendants and were acting at all times relevant
13 to the allegations herein in furtherance of said conspiracy, agency, employment or joint venture. Black
14 and DOES 1 through 10 are collectively referred to herein as "Defendant".

15 **III.    JURISDICTION AND VENUE**

16     9.     This action is for fraud in the inducement, fraudulent concealment, intentional
17 interference with prospective economic advantage and declaratory relief.   This Court has subject
18 matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332(a)(2), because Plaintiff is a citizen
19 of the State of California and Defendant is a foreign entity, an English private limited company.  In
20 addition, the amount in controversy is more than $75,000.

21     10.    Venue is proper in this district pursuant to 28 USC §1391(b)(2) because the harm and
22 injury occurred in this district and this district is where a substantial part of the events and omissions
23 giving rise to this action occurred.

24     11.    This Court has personal jurisdiction over Defendant because the conduct alleged herein
25 was directed at Plaintiff, a citizen of this State and the harm, injury and damage described herein
26 harmed a citizen of this State.  In addition, Defendant consummated a transaction with Plaintiff, a
27 citizen of this state, agreed to Plaintiff's Terms and Conditions which identified "the laws of the State
28 of California, USA, without regard to choice of law principles", and has purposefully availed itself of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

the privilege of conducting business activities in this state.

### IV. PLAINTIFF HIRED DEFENDANT TO MANUFACTURE CRITICAL PARTS FOR A THERMOPLASTIC SEATBACK SKIN PROJECT

12. In or about June 2019, IDEA Air, a key customer of Plaintiff's hired Plaintiff to complete the Project. Plaintiff was to complete its first delivery of products to IDEA Air in the first half of August 2019 for European Union Aviation Safety Agency testing in September.

13. Plaintiff told Defendant about the Project for IDEA Air, identified its production timeline, and asked Defendant to confirm it could make the Parts. Defendant represented that it could make the Parts within the required timeline, and agreed to make the Parts. Thus, Plaintiff hired Defendant to manufacture the Parts for the Project.

14. Defendant also did other work for Plaintiff on the Project. Between April 16, 2019 and July 29, 2019, Plaintiff issued multiple purchase orders directly to Defendant for materials related to the Project. The purchase orders were issued from Plaintiff and authorized by Plaintiff's CEO.

15. The purchase orders contained a copy of Plaintiff's terms and conditions. The terms and conditions provided, in relevant part that:

> BY SHIPPING THE GOODS OR BY ACKNOWLEDGING RECEIPT OF THIS ORDER, VENDOR *[Defendant]* HEREBY AGREES TO THE TERMS AND CONDITIONS OF PURCHASE SET FORTH HEREIN. [Plaintiff] OBJECTS TO ANY DIFFERENT OR ADDITIONAL TERMS IN VENDOR'S ACCEPTANCE OF THIS ORDER.

16. The same Terms and Conditions also identify the laws of the State of California, USA as governing any dispute concerning the order.

17. Defendant agreed to these terms when it accepted the materials. Defendant also issued invoices for the materials identified in these purchase orders.

### V. FULLY AWARE OF THE NECESSARY SPECIFICATIONS AND REQUIREMENTS, DEFENDANT FALSELY PROMISED PLAINTIFF THAT IT COULD MANUFACTURE THE PARTS

18. From the outset, Defendant knew that to manufacture the Parts it would need to: (1) use the Tool that Plaintiff specially created and designed, and (2) have the ability to heat the Tool to a temperature of 310° C.

19. Fully aware of these requirements, Defendant represented that it could manufacture the Parts according to Plaintiff's timeline. Prior to making this representation, and before Plaintiff delivered the Tool to Defendant, Defendant had the Tool specifications, including the material, type, size and weight, and knew about the temperature requirement.

20. On June 25, 2019, when the work was first quoted, Plaintiff provided Defendant with a copy of the full CAD (computer aided design) files for the Tool, which defined the dimensions and specifications for the Tool. On July 18, 2019, Plaintiff's Director of Manufacturing again provided a copy of the full CAD files for the Tool and confirmed the material type for the Tool. Based on this information, Defendant knew the detailed specs, including the size and weight of the Tool. Defendant's Managing Director confirmed receipt of this data and stated that if there were any issues, he would let Plaintiff know. Neither he nor anyone from Defendant identified any further issues.

21. Because it was imperative that Defendant be able to heat the Tool to 310°C to manufacture the Parts, Defendant performed trials using other tools from Plaintiff to confirm that it could heat the Tool to the required temperature. On April 4, 2019, Defendant's Managing Director said, "Just to let you know that we should be able to get our machines to cycle at 310 degrees C, which is great news!"

22. Defendant's website also publicly touts Defendant's CAD and CNC machining skills, indicating that Defendant is highly experience and capable of performing manufacturing projects of a nature similar to production of the Parts. Plaintiff's team members reviewed and relied on the statements on Defendant's website and understood that Defendant has the requisite experience, equipment and skills to manufacture the Parts. Defendant marketed these capabilities directly to Plaintiff, and based on Defendant's marketing efforts, including the statements on its website and the marketing of its experience in the aerospace industry, Plaintiff believed Defendant when it said it could perform and manufacture the Parts.

23. Plaintiff also relied on Defendant's representation that it could perform within the production time frame set by IDEA Air when it chose to hire Defendant.

24. At no point prior to receiving the Tool (including after it had complete information about the Tool dimensions and weight) did Defendant advise Plaintiff that its equipment was unable

to, or even that it might be unable to, accommodate the weight of the Tool.

## VI. DEFENDANT FAILED TO PERFORM, PROMISED PLAINTIFF IT COULD MODIFY THE TOOL TO PERFORM AND THEN IRREPARABLY DAMAGED THE TOOL

25. On or about August 1, 2019, the Tool was delivered to Defendant. The Delivery Note, which Defendant signed when it accepted the delivery, was issued by Plaintiff and included Plaintiff's name and logo.

26. After the Tool arrived, Defendant, for the first time, advised Plaintiff that its manufacturing equipment had weight limitations and could not accommodate the size and weight of the Tool.

27. Although Defendant had the Tool specifications, including the material type, *before* the Tool was ordered and delivered, at no point did Defendant advise Plaintiff that there was even a possibility that Defendant's equipment would be unable to work with the Tool.

28. Then, rather than concede its inability to perform after the Tool arrived, Defendant promised that if it made certain modifications to the Tool to help reduce its weight, Defendant could work with the Tool and timely produce the Parts. Specifically, Defendant promised that if it could cut holes through the Tool, which would hollow out parts of the Tool and reduce its weight, Defendant's manufacturing equipment would be able handle the Tool and it would be able to complete manufacture and delivery of the Parts as scheduled.

29. Because the Tool was expensive, and specially designed, and created by Plaintiff, and delivered to Defendant for the purpose of manufacturing the Parts, Plaintiff was hesitant to agree to any modifications. Plaintiff voiced these concerns to Defendant.

30. In response, Defendant promised that it was 100% sure that the changes it was suggesting would solve the weight issues without affecting its ability to manufacture the Parts.

31. Relying on Defendant's promises, including the CAD and CNC machining skills advertised on Defendant's websites, Plaintiff consented to Defendant's altering of the Tool. Defendant spent several weeks modifying the Tool.

32. Defendant, however, was still unable to perform and the modifications Defendant made

to the Tool – and which Defendant promised would not affect its ability to manufacture the Parts – made Defendant unable to heat the Tool to the required temperature of 310° C.

33. After patiently waiting for Defendant to provide the Parts as promised, in late August 2019, - two months after Plaintiff first provided Defendant with the specifications to manufacture the parts, and weeks after the production deadline - Plaintiff's Chief Technology Officer and Managing Director visited Defendant's facility where he learned that Defendant could not manufacture the Part. Only then did Defendant finally admit that it would not be able to manufacture the Parts as it had represented.

34. Thereafter, Defendant returned the Tool to Plaintiff.

35. Defendant's Managing Director, Production Manager, Project Manager and Vacuum Forming Shop Manager each made the statements described herein to at least the following individuals, Plaintiff's CEO, Manufacturing Operations Manager, and/or Chief Technology & Manufacturing Officer and Managing Director, and Composite Engineer.

36. Each of the individuals with whom Defendant communicated is identified on Plaintiff's website as a member of "the team".

### VII.  PLAINTIFF TRIED, UNSUCCESSFULLY, TO REPAIR THE TOOL

37. Following Defendant's failure to deliver the Parts as promised, Plaintiff tried to find an alternative way to manufacture the Parts so as not to miss its deadline for delivery to Plaintiff's customer. Plaintiff immediately took steps to try to repair the Tool so that it could deliver the seatbacks to its customer on time.  Plaintiff also consulted with other supplier to try to find a replacement manufacturer for the Parts; however these other firms told Plaintiff that the damage Defendant did to the Tool made it unusable.

38. After several months of trying to repair the Tool, it is now clear that because of how badly Defendant damaged the Tool, it cannot be repaired to meet the Project requirements.  Thus, Plaintiff has to order and wait for a replacement Tool to be created and delivered before it can manufacture the Parts and complete the Project.

39. The delay caused by Defendant's false promises that it could perform and its subsequent damage to the Tool caused Plaintiff to default on its delivery commitment.  As a result of

this default, Plaintiff was not able to deliver any product to its customer and lost all sales to the customer for 2019.

40. In addition, because Plaintiff has to now order and wait for a new Tool, its ability to manufacture the Parts in 2020 has been delayed, further increasing Plaintiff's lost sales.

41. These delays have put Plaintiff's relationship with its customer at serious risk, and could result in the cancellation of the Project entirely.

## FIRST CAUSE OF ACTION CLAIM: FRAUD IN THE INDUCEMENT
### (Plaintiff against all Defendants)

42. Plaintiff realleges and incorporates by reference all prior allegations above as though fully set forth herein.

43. Defendant persuaded Plaintiff to hire it to manufacture the Parts based upon promises that it could perform, including promises that it could use the specially created Tool to create the Parts and heat the Tool to the required temperature of 310° C. Defendant made such promises repeatedly, both orally and in writing, when it agreed to manufacture the Parts, before the Tool was order, and after it received the Tool.

44. Plaintiff hired Defendant because it relied, to its detriment on Defendant's statements, including: (i) Defendant's promise that it could perform after receiving the Tool specifications; (ii) Defendant's promise that it could perform after testing its equipment to make sure it could heat the Tool to the required temperature; (iii) the written statements described in Paragraphs 20 to 22 above; and (iv) the statements on Defendant's website.

45. Defendant also persuaded Plaintiff to allow it to modify the Tool because Defendant assured Plaintiff that the modifications would resolve the weight issues Defendant was encountering, *and* that the modifications would allow Defendant to manufacture the Parts as promised.

46. Plaintiff consented to Defendant's modification of the Tool, because it relied, to its detriment, on Defendant's promise that it was 100% sure that the changes it was suggesting would solve the weight issues without affecting its ability to manufacture the Parts.

47. Defendant's Managing Director, Production Manager, Project Manager and Vacuum Forming Shop Manager, each made the statements described herein to at least the following

individuals, Plaintiff's CEO and Managing Director, Manufacturing Operations Manager, Chief Technology & Manufacturing Officer and Managing Director, and Composite Engineer.

48. Defendant knew the size and weight of the Tool, including because it received the CAD specifications and material type, and knew that its equipment could not support the weight of the Tool. However Defendant did not advise Plaintiff of this until after Plaintiff had the Tool made and delivered to Defendant. Defendant further knew, or should have known, that it could not perform before suggesting modifications of the Tool to reduce the weight, and knew, or should have known, given its CAD and CNC machine skills, that the modifications to the Tool would prevent Defendant from heating the Tool to the required temperature and manufacturing the Parts.

49. Had Plaintiff known that Defendant's lacked the equipment needed to use the Tool and manufacture the Parts, Plaintiff would not have hired Defendant to manufacture the Parts and would not have consented to Defendant's alteration of the Tool.

50. As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff is entitled damages, including lost sales caused by Defendant's delay and damage of the Tool, costs to try to repair the tool, and the cost of a replacement tool, which exceed $75,000, and will be shown according to proof at trial.

51. Defendant's fraudulent misrepresentations were made with oppression, fraud, malice, and in conscious disregard of the rights of Plaintiff. Accordingly, Plaintiff is also entitled to punitive damages in a sum according to proof.

**SECOND CAUSE OF ACTION CLAIM: FRAUDULENT CONCEALMENT**

**(Plaintiff against all Defendants)**

52. Plaintiff realleges and incorporates by reference all prior allegations above as though fully set forth herein.

53. At the time Defendant agreed to manufacture the Tool and assured Plaintiff that it could perform within the required time frame, Defendant knew that its equipment had weight limitations. Defendant further knew that its equipment could not handle the size and weight of the Tool because it received the CAD specifications and material type before the Tool was ordered, and it knew the material of the Tool before it was delivered.

54. At no point prior to the delivery of the Tool did Defendant inform Plaintiff that it had any equipment limitation, nor that there was a possibility that the Tool was too heavy for Defendant's equipment.

55. Plaintiff is informed and believes and thereon alleges that by concealing its equipment limitations, Defendant intended to induce Plaintiff into hiring it to manufacture the Parts. Had Plaintiff been made aware of Defendant's equipment limitations, fraudulent omissions or the true facts about its ability to perform, it would not have agreed to hire Defendant to manufacture the Parts and it would not have delivered the Tool to Defendant.

56. Plaintiff is informed and believes and thereon alleges that by concealing the fact that the modifications to the Tool, that Defendant promised Plaintiff would resolve the weight issues, would affect Defendant's ability to heat the Tool to the required temperature of 310° C, Defendant intended to induce Plaintiff into consenting to allow Defendant to modify the Tool so that Defendant could manufacture the Parts. Had Plaintiff been made aware of the fact that Defendant's modification to the Tool would make it unusable, it would not have agreed to let Defendant modify the Tool.

57. As a direct and proximate result of Defendants' fraudulent omissions, Plaintiff is entitled damages, including lost sales caused by Defendant's delay and damage of the Tool, costs to try to repair the tool, and the cost of a replacement tool, which exceed $75,000, and will be shown according to proof at trial.

58. Defendant's fraudulent omissions were done with oppression, fraud, malice, and in conscious disregard of the rights of Plaintiff. Accordingly, Plaintiff is also entitled to punitive damages in a sum according to proof.

## THIRD CAUSE OF ACTION CLAIM: INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
**(Plaintiff against all Defendants)**

59. Plaintiff realleges and incorporates by reference all prior allegations above as though fully set forth herein.

60. At the time Defendant agreed to manufacture the Parts, it knew that they were a critical component of the Project between Plaintiff and its customer. Defendant was further aware that its

timely manufacturing of the Parts was necessary for Plaintiff to satisfy its delivery deadline for the Project to its customer and that Plaintiff's delivery of the Part was critical to Plaintiff meeting this deadline.

61.   Defendant knew that its failure to perform would impact the agreement between Plaintiff and its customer and affect Plaintiff's ability to perform and timely deliver the Project to its customer.  Defendant further knew, or should have known, that the damage it did to the Tool would render the Tool unusable and prevent Plaintiff from hiring a replacement to manufacture the Parts, making it impossible for Plaintiff to satisfy its delivery deadline.

62.   Defendant's fraudulent representations and omissions described herein constitute an independently wrongful act.

63.   As a direct and proximate result of Defendant's fraudulent representations and omissions, Plaintiff defaulted on its delivery deadline.  Because of this default, Plaintiff lost sales, that but for Defendant's conduct described herein, it would have received by timely completing and delivering the Project to its customer.  Moreover, because Defendant damaged the Tool, Plaintiff has continued to lose and will continue to lose sales until a replacement Tool can be created and delivered, and the Parts can be manufactured.

64.   As a direct and proximate result of Defendants' fraudulent omissions, Plaintiff is entitled damages, including lost sales caused by Defendant's delay and damage of the Tool, which exceed $75,000, and will be shown according to proof at trial.

65.   Defendant's fraudulent omissions were done with oppression, fraud, malice, and in conscious disregard of the rights of Plaintiff.  Accordingly, Plaintiff is also entitled to punitive damages in a sum according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

1. For compensatory damages, according to proof, which include damages resulting from Defendant's irreparable damage to the Tool, the cost to replace the Tool, and Plaintiff's lost sales, and which exceed $75,000;
2. For punitive damages;

3. For prejudgment interest at the maximum rate permitted by law; and

4. For such other or further relief as the Court deems just and proper.

DATED: January 23, 2020    REED SMITH LLP

By:    /s/ Jesse L. Miller
      Jesse L. Miller
      Carla M. Wirtschafter
      Attorneys for Plaintiff
      Bright Lite Structures, LLC

### Jury Demand

Plaintiff hereby requests a jury trial on all issues and claims contained herein that are eligible for trial by jury.

DATED: January 23, 2020    REED SMITH LLP

By:    /s/ Jesse L. Miller
      Jesse L. Miller
      Carla M. Wirtschafter
      Attorneys for Plaintiff
      Bright Lite Structures, LLC